Alison K. Guernsey
Clinical Professor
UNIVERSITY OF IOWA COLLEGE OF LAW
380 Boyd Law Building
Iowa City, IA 52245
NY #4667366
(319) 335-9092 phone
alison-guernsey@uiowa.edu
Attorney for Defendant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. 2:17-cr-00041-003-PHX-GMS |
| Plaintiff, | **Reply to the government's response opposing Ms. Wahpeta's reduction-in-sentence motion for her rape and sexual assault** |
| v. | |
| Ilene Marie Wahpeta, | |
| Defendant. | |

The government spends its response addressing why Ilene Wahpeta, a recognized victim of sexual assault, should not be believed. But the DOJ has already decided whether Ms. Wahpeta is lying. And it decided she isn't. It decided she isn't when the U.S. Attorney's Office for the Northern District of California invited her to read a victim impact statement at Officer Andrew Jones's sentencing hearing. If the government believed that Ms. Wahpeta was lying, it would have had a duty to tell the Court. It did not do so. In fact, until its response here, at no point during the duration of Ms. Wahpeta's cooperation with the government has the government questioned what happened to Ms. Wahpeta to either her or her counsel. Nor could it. Because it's true. She was raped and sexually assaulted by two Dublin guards. And, for that reason, applying the pre-November 1 law, a reduction in sentence is appropriate.

1

## I.  The pre-November 1, 2023 law applies to Ms. Wahpeta's claims.

In denying the government's motion to stay, the Court noted there was an open question about "whether the substantiation requirement" set forth in U.S.S.G. § 1B1.13(b)(4) applies.[1] The government's response ignores that question and again presumes the post-November 1 law applies to Ms. Wahpeta.[2] It does not. As Ms. Wahpeta argued in her response to the motion to stay,[3] the pre-November 1 law applies because (1) she exhausted before November 1, and (2) principles of non-retroactivity apply.[4] The pre-November 1 law empowers district court judges to "consider *any* extraordinary and compelling reason for release." *United States v. Aruda*, 993 F.3d 797, 801 (9th Cir. 2021) (emphasis added). This entails considering all facts available to the Court to assess the veracity of the claims before it. *See id.* The pre-November 1 standard does not require the type of substantiation that the government appears to argue is mandatory.[5] But even if it does, for the reasons previously argued, Ms. Wahpeta prevails because she meets the substantiation requirement in U.S.S.G § 1B1.13(b)(4), or she has been unduly delayed and is excused from (b)(4)'s requirement.[6]

## II.  Ms. Wahpeta did not make up that she was raped and sexually assaulted.

Setting aside the legal standard, the core of the government's argument is that Ms. Wahpeta was not abused[7] because she (1) did not immediately report; (2) did not tell her family

---

[1] ECF No. 153.
[2] *See* ECF No. 154, at 10 (citing U.S.S.G. § 1B1.13(b)(4)).
[3] LRCrim 47.1 ("With regard to Forms of Papers and Motion, see rules 7.1 and 7.2" of LRCiv.); LRCiv 7.1(d)(2) ("If a party desires to call the Court's attention to anything contained in a previous pleading. . .the party shall do so by incorporation by reference.").
[4] *See* ECF No. 150, at 4–7.
[5] *See* ECF No. 154, at 10.
[6] *See* ECF No. 146, at 18–19; ECF No. 149, at 7–12.
[7] *See* ECF No. 154, at 5, 10.

2

and friends about her abuse in letters that BOP officials would read; (3) sought counsel; (4) gave "remarkably similar" statements to other victims; and (5) could not be "corroborated."[8] The government's position conflicts with the position that the DOJ has taken in other litigation, and it ignores social science, methods of evidentiary analysis, and the facts.

### A. The U.S. Attorney's Office for the Northern District of California's actions show that Ms. Wahpeta did not fabricate her claims.

First, the U.S. Attorney's Office for the Northern District of California has already determined Ms. Wahpeta is not lying. It invited Ms. Wahpeta to give a victim impact statement at Officer Jones's sentencing hearing.[9] Not only that, but it was an AUSA from the N.D. of California—*not* Ms. Wahpeta—who originally broached the idea of Ms. Wahpeta's participation.[10] This was after the AUSA had met with Ms. Wahpeta in September 2023.[11] Ms. Wahpeta declined the invitation to testify, and the N.D. of California followed up to invite her to write and read a victim impact statement.[12] They even made arrangements with the Court and the prison for this to happen over Zoom.[13] To make this invitation, the N.D. of California must have believed that Ms. Wahpeta met the definition of a "crime victim." 18 U.S.C. § 3771(a)(4). A "crime victim" is defined as a "person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A). Only a "crime victim" can give a victim impact statement. 18 U.S.C. § 3771(a)(4).

The government is right that Officer Jones's defense counsel objected to Ms.

---

[8] *See id.* at 2–5.
[9] *See* Ex. S, at 1.
[10] *See id.*, at 1-2.
[11] *See* ECF No. 156, Ex. 10, at 1.
[12] *See* Ex. S, at 1.
[13] *See id.*, at 4-7.

Wahpeta's statement because she was not a "statutory victim" and claimed there was an email from an AUSA stating that Ms. Wahpeta's and A.N.'s statements were not "sufficiently reliable to be considered."[14] But, in response, the AUSA clarified that the "government could not sufficiently corroborate their statements to allow the government to present their allegations to the court for consideration at sentencing."[15] "Not sufficiently corroborate[d]" does not mean untrue. If the AUSA had believed the statements were untrue, then he would have been obligated by statute and Rules of Professional Conduct to prevent Ms. Wahpeta from speaking.[16] Yet the AUSA paved the way for her to speak.

There are many reasons why the government could not have been able to "sufficiently corroborate" Ms. Wahpeta's statement for purposes of a sentencing hearing. It could mean that the Northern District of California made a strategic decision to not further investigate Ms. Wahpeta's claim against Officer Jones because it had already achieved a conviction and did not need her testimony. The District has used this strategy in Dublinc cases before. During the Warden Garcia prosecution, for example, the government was planning to call at least five unnamed victims at trial to testify to unindicted conduct.[17] The defense argued that the unnamed victims could not be relied on, and it requested an evidentiary hearing to make this credibility determination.[18] The government moved forward without the unnamed victims'

---

[14] ECF No. 154, at 3–4.
[15] ECF No. 150, Ex. A, at 23–24.
[16] Rule 3.3(a)(3) of the California Rules of Professional Conduct states a "lawyer shall not . . . offer evidence that the lawyer knows to be false." "Knows" is defined as "actual knowledge of the fact in question" and that "a person's knowledge may be inferred from circumstances." Cal. Rules of Pro. Conduct r. 1.0.1(f).
[17] *See United States v. Garcia*, No. 4:23-cr-00429-YGR, ECF No. 145, at 4–5, 9 (N.D. Cal.).
[18] *See id.*, ECF No. 148, at 1–2.

4

testimony.[19] Again, "not sufficiently corroborated" by the government does not mean untrue. Rather, the U.S. Attorney's Office for the Northern District of California's actions show that Ms. Wahpeta's claims are not fabricated. They show quite the opposite.

### B. Ms. Wahpeta's reluctance to report abuse to people who had failed to protect her and placed her in the SHU does not mean she is lying.

But even if the issue of Ms. Wahpeta's credibility has not yet been decided, the facts show that she was raped and sexually abused. Contrary to the government's argument, the failure to immediately report abuse, does not mean Ms. Wahpeta is lying.[20] As she explained to the U.S. Attorney's Office for the Northern District of California, Ms. Wahpeta did not report her abuse because she was afraid of retaliation[21] and feared she was "under investigation."[22] This belief was reinforced by the fact that nobody had told her why she had been placed in the SHU, and no one had come to talk to her once there.[23] Civil litigation has revealed that FCI Dublin used this tactic to discourage survivors from reporting.[24] The first time that Ms. Wahpeta had the opportunity to report her abuse *after* her abusers had been removed from the prison was on June 2, 2022—78 days after first being taken to the SHU. Believing she was "under investigation,"[25] she was taken to a meeting with the FBI.[26] This meeting resembled an interrogation.[27] Ms. Wahpeta said that the questions were "really

---

[19] *See id.*, ECF No. 168, at 9–10.
[20] *See* ECF No. 154, at 5.
[21] *See* ECF 156, Ex. 10, at 8.
[22] *See* Exhibit T (Letter from the SHU).
[23] *See* ECF No. 146, Ex. C, ¶¶ 74–77.
[24] *See* Cal. Coal. for Women Prisoners v. United States of Am. Fed. Bureau of Prisons, No. 3:23-cv-04155-YGR, ECF No. 10, at 14, 16 (N.D. Cal. Aug. 17, 2023).
[25] *See* Exhibit T.
[26] *See* ECF No. 156, Ex. 9.
[27] *See* ECF No. 146, Ex. C, at ¶¶ 81–84.

5

direct."[28] When Ms. Wahpeta met with the FBI again in September 2023, it was the same male FBI agent acknowledged how harsh his questioning was in the first interview. Harsh questioning is a proven way to retraumatize survivors which dissuades them from reporting.[29]

Moreover, as Dr. Terry Kupers—a board-certified psychiatrist with nearly 50 years of experience who specializes in how carceral environments impact mental health and who has testified in front of the PREA Commission multiple times[30]—noted in his evaluation of Ms. Wahpeta's case, she likely "distrust[ed] others in positions of official authority" because her abusers had acted "in their capacity as government employees who ha[d] a duty to protect and care for her."[31] Ms. Wahpeta's reluctance to report reflects what science says about how survivors of carceral sexual abuse act. As Dr. Kupers explains,

> [t]he reasons for underreporting are complex, and there are many variables. The one that stands out is that women who are sexually abused by staff very often do not report the abuse. Of course, their shame plays a role. But I have interviewed hundreds of women who have been the victims of sexual abuse in prison and all of them report they are terrified about retaliation for reporting abuse, or they are terrified they will be consigned to solitary confinement, even if their transfer . . . is officially designated "protection."[32]

### C. Ms. Wahpeta's reluctance to tell her parents in BOP-monitored letters that she had been raped does not mean she is lying.

Ms. Wahpeta's failure to "tell her parents she is personally a victim of sexual abuse" in her letters from the SHU also do not indicate she is lying.[33] First, Ms. Wahpeta's primary

---

[28] *Id.* ¶ 82.
[29] *See* Emma Lathan et al., *The Promise Initiative: Promoting a Trauma-Informed Police Response to Sexual Assault in a Mid-Size Southern Community*, 47 J. Cmty. Psych. 1733, 1735–36 (2019).
[30] *See* ECF No. 146, Ex. I-2.
[31] *See* ECF No. 146, Ex. I-1, at 22.
[32] *Id.* at 4.
[33] ECF No. 154, at 5. Ms. Wahpeta's letter to "Dad" is not addressed to her biological father. "Dad" is a close friend who has no familial relation.

6

concern was her safety.[34] As Ms. Wahpeta sat in the SHU for nearly three months, she learned that investigators were interested in the sexual abuse at FCI Dublin.[35] She had a decision to make: "[D]o the right thing or just sit here [and] do the rest of my time and forget everything I saw?"[36] In other words, Ms. Wahpeta had to weigh whether she should report and face the very real risk of retaliation[37] or keep quiet and stay safe. Given that Ms. Wahpeta was never told why she was placed in the SHU in the first place,[38] it's reasonable to conclude it was because FCI Dublin was using the SHU to discourage reporting.[39] Ultimately, when Ms. Wahpeta was taken to the first FBI meeting, she denied the abuse because she "was scared that if [she] reported [her] abuse to someone at FCI Dublin, another guard might find out and write [her] up or hurt [her]."[40]

Second, why would anyone want to tell their family that they were raped, particularly in a letter from prison the BOP would read? Although Ms. Wahpeta told her mom that "all kinds of officers [are] getting walked off [for] sexual assaults," she begged her mom "don't be mad at me" because she "didn't do nothing wrong."[41] As she explained to the FBI,[42] Ms.

---

[34] *See* ECF No. 156, Ex. 7, at 3 ("I know what I should do but I don't want [people] looking at me as a snitch. You know, that's my main concern, [because] [people] will talk, but my thing is also is I don't [want to] testify or nothing in court. I'm too embarrassed.").
[35] *See id.* at 2.
[36] *Id.* at 1–2.
[37] *See* Cal. Coal. for Women Prisoners v. United States of America Fed. Bureau of Prisons, No. 3:23-cv-04155-YGR, ECF No. 10, at 14, 16 (N.D. Cal. Aug. 17, 2023).
[38] Ex. T, at 1 ( "I've been down [in the SHU] for 2 weeks now since the 16th. So I'm under investigation. Nobody's come to talk to us. . . . . I don't know why I'm here.").
[39] *See* Cal. Coal. for Women Prisoners v. United States of America Fed. Bureau of Prisons, No. 3:23-cv-04155-YGR, ECF No. 10, at 14, 16 (N.D. Cal. Aug. 17, 2023).
[40] ECF No.146, Ex. C, at ¶ 94.
[41] Ex. T, at 1.
[42] ECF No. 156, Ex. 10, at 7 ("Wahpeta felt lower than dirt.").

Wahpeta was embarrassed.[43] And this makes sense. Most survivors of sexual abuse feel "shame, self-loathing, and a sense of failure."[44] In fact, Ms. Wahpeta has never told her family about her abuse. Undersigned counsel did.[45]

### D. Ms. Wahpeta's request for a lawyer does not mean that she is lying.

The government's last assertion about reporting behavior is that because Ms. Wahpeta wanted a lawyer, she should not be believed.[46] Ms. Wahpeta was not concocting a scheme to get herself out of prison.[47] She was crying out for help:

> Mom I'm really writing [for] some [advice]. See I've been in the SHU going on 3 months now. But the FBI came to talk to my friend last week [they're] saying she's having an relationship with one of my bosses [at] work. She denied it all but now she's sitting here thinking about it. We don't know what to do. Honestly, I think I need a lawyer for this one [because] if we say anything or before we say anything we [want to] know if we talk will this get us home. . . . . I guess what I'm saying is do I do the right thing or just sit here [and] do the rest of my time and forget everything I saw or had to look for, I know I'm grown and a lot of things were consensual but that is against the law. I'm lost right now [and] I feel only you can tell me what I should do.[48]

The Supreme Court has been clear "lawyers in criminal courts are necessities, not luxuries." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). That Ms. Wahpeta wanted to seek the advice of counsel should not be used against her. She simply "require[d] the guiding hand of counsel" to protect her because she knew FCI Dublin was not going to do that for her. *Id.* (quoting *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932)).

---

[43] *See* ECF No. 146, Ex. F, at 4; ECF No. 146, Ex. C, at ¶ 94; ECF No. 150, Ex. A, at 32.
[44] *See* ECF No. 146, Ex. I-1, at 22.
[45] *See* ECF No. 156, Ex. 11, at 8.
[46] *See* ECF No. 154, at 4.
[47] *See id.*
[48] ECF No. 156, Ex. 7, at 1–2.

8

### E. Evidence shows that Ms. Wahpeta is not making this up.

Finally, the way that federal courts typically review the credibility of sexual-abuse victims also shows that Ms. Wahpeta is credible. Although not strictly applicable in this context, Congress has outlined an analytical framework to assess the veracity of sexual-assault claims.[49] Federal Rule of Evidence 413 permits factfinders to consider evidence of other sexual assaults committed by the accused in sexual-assault cases. *See* Fed. R. Evid. 413. Because of the uniqueness of sex crimes,[50] factfinders are permitted to use prior sexual assaults as "evidence that the defendant has the motivation or disposition to commit sexual assaults, and a lack of effective inhibitions against acting on such impulses, and as evidence bearing on the probability or improbability that the defendant was falsely implicated in the offense of which he is presently accused." 137 Cong. Rec. S3191-02, S3239 (1991). Employing the FRE 413 analysis here supports Ms. Wahpeta.

Ms. Wahpeta is not Officer Jones's only victim.[51] Officer Jones pleaded guilty to the repeated rapes and sexual abuse of three other women.[52] This is not a coincidence. There is a pernicious pattern to Officer Jones's criminal behavior.[53] Although the sheer frequency of Officer Jones's abuse should be enough to prove the veracity of Ms. Wahpeta's own claims, as outlined in Exhibit T, Ms. Wahpeta's abuse falls within a neat timeline of Officer Jones's

---

[49] *See* Jessica D. Khan, *He Said, She Said, She Said: Why Pennsylvania Should Adopt Federal Rules of Evidence 413 and 414*, 52 Villanova L. Rev. 641, 676 (2007) (noting that unlike other crimes, the issues of prosecuting sex crimes "include[] a lack of physical evidence, a lack of witnesses other than the victim, delays in reporting, societal bias against believing women and children who report sexual crimes and an overall focus on the victim's credibility").
[50] *Id.*
[51] *See* ECF No. 146, Ex. B, at ¶ 2(b)–(k).
[52] *See* ECF No. 146, Ex. B, at ¶ 2(b)–(k).
[53] *See* Ex. U.

predatory style of abuse.[54] This is not a coincidence. This Court should carefully read the descriptions of Officer Jones's abuse of the three women he pleaded guilty to raping. Officer Jones admits to a pattern of singling out his victim, taking her to a secluded area, and forcing her to have sex with him.[55] Ms. Wahpeta is not the only victim Officer Jones singled out.[56] Ms. Wahpeta is not the only victim Officer Jones directed to go to the staff bathroom of the kitchen.[57] Ms. Wahpeta is not the only victim Officer Jones forced to have vaginal sex.[58] And this is not a coincidence. Ms. Wahpeta's account of what happened to her is much like the other victims. Not because she is lying,[59] but because Officer Jones followed a pattern.

**III.   The § 3553(a) analysis focuses solely on her crime and ignores all else.**

Finally, the § 3553(a) factors support release.[60] Although her crime was very serious,[61] who Ms. Wahpeta is *today* shows that she is ready to come home. *See Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (internal citation omitted) (requiring consideration of post-offense rehabilitation). Ms. Wahpeta has not just "claimed" [62] she is a different person; she has shown

---

[54] *See* Ex. U.
[55] *See* ECF No. 146, Ex. B, at ¶ 2(b)–(k).
[56] *Compare* ECF No. 146, Ex. B, at ¶ 2(b)–(c), (f)–(j) (Officer Jones admits instructing C.V., J.L., and R.C. to certain rooms away from others or already being in the room alone with his victims) *with* ECF No. 146, Ex. C, at ¶¶ 33–36, 61–65 (Officer Jones directed Ms. Wahpeta to go with him to the staff bathroom where Officer Jones locked the door).
[57] *Compare* ECF No. 146, Ex. B, at ¶ 2(b)–(c), (h), (j) (Officer Jones admits taking C.V. and R.C. to the staff bathroom) *with* ECF No. 146, Ex. C, at ¶¶ 33–36, 61–65 (Officer Jones directed Ms. Wahpeta to go to the bathroom).
[58] *Compare* ECF No. 146, Ex. B, at ¶ 2(c)–(e), (g), (i)–(k) (Officer Jones admits having vaginal sex with C.V., J.L., and R.C) *with* ECF No. 146, Ex. C, at ¶¶ 40, 68 (Officer Jones vaginally penetrated Ms. Wahpeta).
[59] *See* ECF No. 154, at 5.
[60] *See id.* at 12–13.
[61] *See* ECF No. 146, Ex. J, at 15.
[62] ECF No. 154, at 12.

she is through her post-incarceration conduct. She has completed substance abuse treatment,[63] willingly put herself in harm's way to protect other survivors,[64] became a mentor and leader for other women,[65] kept strong relationships with her family,[66] and prepared herself for life beyond bars.[67] Ms. Wahpeta's release date is June 2025, and she is eligible for a halfway house in July 2024. *See* 18 U.S.C. § 3624(c). Ms. Wahpeta's post-conviction conduct shows that she will not endanger her community. She will better it.

### IV. Conclusion

Ms. Wahpeta was the victim of sexual abuse by guards at FCI Dublin. The government treated her as a victim in Officer Andrew Jones's case and now attempts to retract that designation. Because Ms. Wahpeta was abused, and because her abuse is an "extraordinary and compelling" reason for a reduced sentence, this Court should use its authority to grant Ms. Wahpeta's motion under 18 U.S.C. § 3582(c)(1)(A).

Dated:     January 29, 2024

*/s/ Alison K. Guernsey*
Alison K. Guernsey
Attorney for Ilene Wahpeta
Clinical Professor
*Pro Hac Vice Admission*
UNIVERSITY OF IOWA COLLEGE OF LAW
FEDERAL CRIMINAL DEFENSE CLINIC
Student Practitioners:
- Andrew Wendel
- Madison Huntzinger

380 Boyd Law Building
Iowa City, IA 52245

---

[63] *See* ECF No. 146, Ex. L, at 9.
[64] *See* ECF No. 146, at 26–27.
[65] *See id.* at 28–29.
[66] *See id.* at 29.
[67] *See id.* at 27, 29–30.

11

NY #4667366
(319) 335-9023 phone
alison-guernsey@uiowa.edu

**Certificate of Service**

I certify that on January 29, 2024, I filed the above using the CM/ECF System, thereby sending notification to: Raynette Logan, U.S. Attorney's Office.

*s/ Alison K. Guernsey*
Alison K. Guernsey